**GUTRIDE SAFIER LLP**
SETH A. SAFIER (State Bar No. 197427)
MARIE A. MCCRARY (State Bar No. 262670)
ANTHONY J. PATEK (State Bar No. 228964)
HAYLEY REYNOLDS (State Bar No. 306427)
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 336-6545
Facsimile:  (415) 449-6469

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEHVA ROFFMAN and LISA CHONG, as individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PERFECT BAR, LLC,<br><br>Defendant. | CASE NO. 3:22-cv-02479-JSC<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW<br><br>JURY TRIAL DEMANDED |

**INTRODUCTION**

1.      Plaintiffs Mehva Roffman and Lisa Chong, by and through their counsel, bring this class action against Defendant Perfect Bar, LLC ("Defendant") to seek redress for its unlawful practices in labeling and marketing its consumer food products.

2.      Consumers are increasingly health conscious and, as a result, many consumers seek foods high in protein. To capitalize on this trend, Defendant prominently labels its consumer food products as providing specific amounts of protein per serving depending on the product, such as "15G PROTEIN" on the front of the Perfect Bar in Dark Chocolate Chip Peanut Butter flavor and "7G PROTEIN" on the front of the Perfect Peanut Butter Cups Dark Chocolate flavor. Consumers, in turn, reasonably expect that each product will actually provide the amount of protein per serving claimed on the front of the product package in a form that can be used by the body as protein.

3.      However, the Food and Drug Administration ("FDA") prohibits such front label claims about the amount of protein, unless manufactures also provide additional information in the nutrition fact panel about how much of the recommended daily value for protein that the product will actually provide. 21 C.F.R. §§ 101.9(c)(7)(i), 101.13 (b), (n). That is because the Food and Drug Administration ("FDA") recognizes that (1) when manufacturers tout an amount of protein on the front label that amount is likely to be material to purchasing decisions, even though reasonable consumers may not know the total amount of protein they need to ingest on a daily basis, and (2) not all proteins are the same in their ability to meet human nutritional requirements, so a simple statement about the number of grams does not actually inform consumers about how much usable protein they are receiving. Some proteins are deficient in one or more of the nine amino acids essential to human protein synthesis and/or are not fully digestible within the human gut. When a human body uses up the least prevalent essential amino acid from a food product, protein synthesis shuts down and all of the remaining amino acids from that protein source degrade mostly into waste. Likewise, whatever portion of a protein source is not digestible is similarly unavailable for protein synthesis. A protein's ability to support human nutritional requirements is known as its "quality."

4.      The FDA required method for measuring protein quality is called the "Protein

Amended Class Action Complaint

Digestibility Corrected Amino Acid Score"—known by its acronym PDCAAS (pronounced Pee-Dee-Kass). It combines a protein source's amino acid profile and its percent digestibility into a discount factor ranging from 0.0 to 1.0 that, when multiplied by the total protein quantity, shows how much protein in a product is actually available to support human nutritional requirements. The regulations term this the "corrected amount of protein per serving." 21 C.F.R. § 101.9(c)(7)(ii). For example, a PDCAAS of 0.5 means that only half of the protein in that product is actually available to support human protein needs. If the product contained 10 grams total protein per serving, the corrected amount of protein would be only 5 grams per serving.

5.      Because protein products can vary widely in their ability to support human protein needs (even between two comparator products with the same total protein quantity) and consumers are generally unaware about the usability of various proteins, and may even be unaware of the total amount of usable protein they should ingest each day, the FDA prohibits manufacturers from advertising or promoting their products with a protein claim unless they have satisfied various requirements, of which two are most important here.  First, the manufacturer must calculate the "corrected amount of protein per serving" based on the quality of the product's protein using the PDCAAS method. Second, the manufacturer must use the PDCAAS computation to provide "a statement of the corrected amount of protein per serving" The FDA prohibits front label claims about the amount of protein, unless manufactures also provide information about the protein quality in the nutrition fact panel ("NFP") "expressed as" a percent daily value ("%DV") and placed immediately adjacent to the statement of protein quantity. 21 C.F.R. § 101.9(c)(7)(i)-(iii). The %DV is the corrected amount of protein per serving divided by the daily reference value for protein of 50 grams. *Id.* Using the same example of a product containing 10 grams total protein per serving with a PDCAAS of .5, the %DV is 10% (5g/50g). Had all of the protein in the product been useful in human nutrition, the %DV would be 20% (10g/50g).

6.      The primary protein source in Defendant's products is nut protein (including peanuts, cashews, and almonds). Nuts are low quality protein with a PDCAAS score of between 0.4 and 0.5, which means that only 40-50% of the protein in Defendant's products is actually

available to support human protein needs. Accordingly, although Defendant advertises its Perfect Bar in Dark Chocolate Chip Peanut Butter flavor, for example, with a "15g PROTEIN" claim, it actually provides, in a form that humans can use, as little as 7.5 grams of protein, i.e., less than half the protein consumers reasonably expect to receive based on the label.

7.      Nevertheless, Defendant failed to provide in the NFP a statement of the corrected amount of protein per serving calculated according to the PDCAAS methodology and expressed as a %DV on many of its products including the Perfect Peanut Cups, Perfect Bites, and Perfect Kids Bars,. Accordingly, the protein claims on the front of the package, such as "10g PLANT-BASED Protein" are unlawful and in violation of parallel state and federal laws. 21 C.F.R. § 101.9(c)(7)(i), 101.13(b), (n). The failure to include a statement of the corrected amount of protein inside the NFP also rendered the NFP itself unlawful. *Id.* § 101.9(c)(7)(i).

8.      Defendant's unlawful conduct caused Plaintiffs and members of the Class to pay a price premium for the products.

## PARTIES

9.      Mehva Roffman ("Roffman") is an individual and a resident of San Francisco, California.

10.      Lisa Chong ("Chong") is an individual and a resident of San Francisco, California.

11.      Roffman and Chong are collectively referred to hereafter as "Plaintiffs."

12.      Defendant Perfect Bar, LLC. ("Defendant") is a corporation existing under the laws of Delaware with its principal place of business in San Diego, California.

## JURISDICTION AND VENUE

13.      This Court has jurisdiction over the subject matter of this action pursuant to 28

14.      U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

15.      The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products provided to persons in the

State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

17.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## **SUBSTANTIVE ALLEGATIONS**

18.     Defendant manufactures, distributes, markets, advertises, and sells a variety of protein products in the United States under the brand name "Perfect Bar." These products, including protein bars and peanut butter cups, have packaging that predominately, uniformly, and consistently states on the principal display panel of the product labels that they contain and provide a certain amount of protein per serving. Plaintiffs attach as Exhibit A to the original Complaint a non-exhaustive list of the products that make protein claims on the front of the product packages. The products listed in Exhibit A, and any other Perfect Bar brand products (including any discontinued flavors sold during the Class Period) that claim a specific amount of protein on the front of its label, will hereinafter be referred to as the "Products."

19.     The representation that the Products contain and provide a specific amount of protein per serving was uniformly communicated to Plaintiffs and every other person who purchased any of the Products. The same or substantially similar product label has appeared on each Product during the entirety of the Class Period in the general form of the following example:

1
2
3
4
5
6
7
8
9
10
11
12
13



14      20.     The nutrition facts panel on the back of some of Products, including the Perfect

15  Peanut Butter Cups, Perfect Bites, and the Perfect Kids Bars, uniformly and consistently failed to

16  provide any statement of the corrected amount of protein per serving, expressed as a %DV,

17  throughout the Class Period. The nutrition facts panel of the Products has appeared consistently

18  throughout the Class Period in the general form of the following example (from the Perfect

19  Peanut Butter Cup Dark Chocolate flavor):

20
21
22
23
24
25
26
27
28

21.    As described in detail below, Defendant's front label protein claims, which advertise the Products as containing and providing specific amounts of protein per serving, are unlawful because Defendant did not: (1) calculate the "corrected amount of protein per serving" based on the quality of the product's protein using the PDCAAS method; and (2) provide a statement of that corrected amount of protein per serving in the NFP, expressed as %DV. 21 C.F.R. § 101.9(c)(7)(i) & (iii). Defendant's failure to comply with § 101.9 also makes the front label claims unlawful under §§ 101.13(n) and (b). The unlawful front label protein claims induced consumers to purchase the Products at a premium price. Had Defendant not included a protein claim on the front label of its Products, as required by FDA regulations, reasonable consumers would not have purchased or would have paid less for the Products.

22.    Defendant's NFP is also unlawful due to its failure to comply with § 101.9(c)(7)(i). Had Defendant included the required statement of the corrected amount of protein per serving, expressed as a %DV, it would have revealed that the Products provide significantly less protein than claimed because Defendant uses low quality proteins in its products. The absence of this information also allowed Defendant to charge a price premium. Had Defendant provided the %DV in the NFP, reasonable consumers would not have purchased or would have paid less for the Products.

**Consumer Demand for Protein**

23.    Many American consumers are health conscious and seek wholesome, natural foods to keep a healthy diet, so they routinely rely upon nutrition information when selecting and purchasing food items. This is especially true in the community of athletes, registered dietitians, and coaches, to which Defendant markets. As noted by FDA Commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet."

Indeed, the FDA recommends relying on Nutrition Facts Labels as the primary tool to monitor the consumption of protein.[1]

24. Protein is found throughout the body—in muscle, bone, skin, hair, and virtually every other body part or tissue. The health benefits of protein are well studied and wide ranging. Scientific studies have confirmed that protein can assist in weight loss, reduce blood pressure, reduce cholesterol, and control for risk factors for cardiovascular diseases. The National Academy of Medicine recommends that adults get a minimum of .8 grams of protein for every kilogram of body weight per day, or just over 7 grams for every 20 pounds of body weight.[2] For a 140-pound person, that means about 50 grams of protein each day. For a 200-pound person, that means about 70 grams of protein each day.

25. Athletes and fitness enthusiasts typically consume much higher amounts of protein each day; typically between 1 to 1.5 grams of protein for every pound of body weight.

26. The health benefits of protein are just as important, if not more important, for children. Children are in a relative state of constant growth and rely on protein as the building block of muscle, bone, skin, hair, and virtually every other body part or tissue. The National Academies of Science recommends the following amounts of daily intake of protein based on age group: 1-3 years old: 13 g of protein per day; 4-8 years old: 19 g of protein per day; 9-13 years old: 34 g of protein per day.[3]

27. Protein *quantity* by itself does not tell the full story of protein from a human nutritional standpoint. A protein's *quality* is also critical because humans cannot fully digest or utilize some proteins. Proteins are not monolithic. They are simply chains of amino acids, and different types of amino acids chained together in different ways will make different types of proteins. Further, the makeup of the protein changes the function of that protein in the body, and certain types of proteins are more easily digested and used by humans than others.

---

[1] FDA Protein Fact Sheet,
https://www.accessdata.fda.gov/scripts/InteractiveNutritionFactsLabel/factsheets/Protein.pdf
[2] National Academies of Medicine. *Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (Macronutrients).*
[3] *Id.*

28.     All of a human's proteins are formed through the process of protein synthesis within their own bodies. That is, although humans consume dietary proteins, they digest those proteins, break them down into their constituent amino acids, and then use those amino acids as building blocks to synthesize the human proteins necessary for life, tissue repair, and other functions. Of the twenty total amino acids, humans can produce only eleven of them on their own. Humans cannot produce, under any circumstances, nine of the amino acids required for protein synthesis. These nine amino acids are called the "essential amino acids" and they must be supplied through a person's diet.

29.     All nine essential amino acids are necessary for protein synthesis to take place. Lacking even one essential amino acid will prevent protein synthesis from occurring, and the rest of the proteins will degrade into waste. Accordingly, once the body uses up the limiting essential amino acid from a protein source, the remainder of that protein becomes useless to human protein synthesis and has little nutritional value. As the FDA has explicitly recognized, "[b]ecause excess amino acids are not stored in the body, humans need a constant supply of good quality dietary proteins to support growth and development." 58 Fed. Reg. 2079 at 2101. High-quality proteins, therefore, are those that contain all nine essential amino acids because they have a greater effect on protein synthesis and are fully digestible. A dietary protein containing all of the essential amino acids in the correct proportions is typically called a "complete protein."

30.     A protein source's digestibility also affects the amount of useable protein a person receives from consuming it. Many plant-based proteins are only 85% digestible, meaning 15% of the protein from that source will simply pass through the body without ever being absorbed at all.

31.     As the FDA has stated in official guidance, "Accurate methods for determining protein quality are necessary because different food protein sources are not equivalent in their ability to support growth and body protein maintenance." 56 Fed. Reg. 60366, § B. The Protein Digestibility Corrected Amino Acid Score ("PDCAAS"), is the FDA mandated measure of protein quality, and it accounts for both the amino acid profile and the digestibility of the protein. 21 C.F.R. § 101.9(c)(7)(ii).

32.     The PDCAAS method requires the manufacturer to determine the amount of essential amino acids that the food contains and then combine that with the proteins' digestibility into an overall discount factor (i.e., a "score" from 0.0-1.0) that represents the actual amount of protein the food provides nutritionally when multiplied by raw protein quantity. The regulations term this the "corrected amount of protein per serving." 21 C.F.R. § 101.9(c)(7)(i).

33.     Defendant uses plant-based nut proteins in its products. Because of the differences in benefits depending on the amino acid composition of a protein, the source of protein is important. Whey protein is animal-based and contains all nine essential amino acids. It has a high biological value and is fully digestible by humans. Thus, whey protein has a PDCAAS of 1.0. Plant proteins rarely contain all nine essential amino acids.  Further, plant proteins such as nut proteins (including peanuts and almonds), which Defendant uses in the Products according to the ingredient lists, are of low quality to humans. These types of proteins typically have a PDCAAS of between .4 and .5, meaning only 40-50% of the protein from those sources will be useable by humans as protein. Accordingly, Defendant's use of low quality proteins means that they actually provide far less protein to humans than the Product labels claim.

**Federal and State Regulations Governing Food Labeling**

34.     Identical federal and California laws regulate the content of labels on packaged food. The requirements of the federal Food, Drug & Cosmetic Act ("FDCA"), and its labeling regulations, including those set forth in 21 C.F.R. §§ 101, 102, were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."). The federal laws and regulations discussed below are applicable nationwide to all sales of packaged food products. Additionally, none of the California laws sought to be enforced here imposes different requirements on the labeling of packaged food for sale in the United States.

35.     According to FDA regulations, "[a] statement of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the

RDI or DRV for protein, as appropriate, and expressed as a Percent of Daily Value . . . **shall** be given if a protein claim is made for the product . . ." 21 C.F.R. 101.9(c)(7)(i) (emphasis added). If a manufacturer does not want to perform PDCAAS and provide a statement of the corrected amount of protein per serving in the NFP, then it shall not make any protein claims.

36.     The regulation governing nutrient content claims, section 101.13, also makes this plain. Section 101.13(n) provides that "[n]utrition labeling in accordance with § 101.9 . . . shall be provided for any food for which a nutrient content claim is made" and § 101.13(b) states "a nutrient content claim[] may not be made on the label . . . unless the claim is made in accordance with this regulation [i.e., § 101.13] . . . ." In other words, a manufacturer may not make any protein nutrient content claims on the front labels of their products unless they have complied with the requirements for protein labeling in the nutrition facts panel pursuant to section 101.9(c)(7). Indeed, the FDA made clear when promulgating § 101.13(n) that it means that a manufacturer can only make "a nutrient content claim . . . on the label or in labeling of a food, provided that the food bears nutrition labeling that complies with the requirements in proposed § 101.9." 58 Fed. Reg. 2302, 23310.

37.     Further, FDA regulations require the %DV to be calculated using PDCAAS, a method that accounts for both protein quantity and protein quality. 21 C.F.R. § 101.9(c)(7)(i)-(iii); FDA Food Labeling Guide, p. 29, Question N.22.[4] The first step is to calculate the "corrected amount of protein per serving" by multiplying protein quantity by the PDCAAS quality value, and then dividing that "corrected amount" by 50 grams (the "recommended daily value" for protein) to come up with the %DV. *Id.*

38.     The Products all make protein claims on the front label, but fail to provide a statement of the corrected amount of protein per serving in the NFP calculated according to the PDCAAS method. The protein claims on the front of these Products are, therefore, unlawful, and

---

[4] Guidance for Industry: A Food Labeling Guide ("FDA Food Labeling Guide") p. 29, Question N22, U.S. Food & Drug Administration, https://www.fda.gov/media/81606/download (last accessed February 18, 2020).

were never permitted to be on the labels in the first instance under §§ 101.9(c)(7)(i), 101.13(n), and 101.13(b).

39.     Defendant's use of a front-label protein claim, while failing to include the required statement of the corrected amount of protein per serving in the NFP calculated using the PDCAAS method and expressed as a %DV, enabled Defendant to conceal the fact that its Products consist of low quality proteins that simply do not provide all of the protein that quantity alone represents. Indeed, when promulgating 21 C.F.R. § 101.9(c)(7), the FDA explained in published guidance that "Information on protein quantity alone can be misleading on foods that are of low protein quality." It also explained that it was prohibiting manufacturers from making any protein claims at all *unless* the manufacturer provides a statement of the corrected amount of protein per serving in the NFP based on PDCAAS. 58 Fed. Reg. 2079 at 2101-2.

**Defendant's Marketing and Labeling of the Products Violates State and Federal Food Labeling Laws**

40.     Defendant's Products are unlawful, misbranded, and violate the Sherman Law, California Health & Safety Code § 110660, *et seq.* Defendant makes protein content claims on the front of the Product packages even though, for some of the Products, it uniformly fails to provide a statement of the corrected amount of protein per serving in the NFP calculated according to the PDCAAS method and expressed as a %DV as required by 21 C.F.R. § 101.9(c)(7)(i). Defendant's failure to comply with this requirement render its front label protein claim unlawful per se and the product misbranded pursuant to §§ 101.13(n) and (b), as well as under § 101.9(c)(7)(i) itself. Defendant's omission of the %DV from the NFP despite the fact that it makes front label protein claims is also renders its NFP unlawful in violation of § 101.9(c)(7)(i)-(iii).

41.     Defendant's marketing, advertising, and sale of the Products violates the false advertising provisions of the Sherman Law (California Health & Safety Code §§ 110390, *et. seq.*), including but not limited to sections 110398 and 110400, which make it unlawful to advertise misbranded food.

42.     Defendant's marketing, advertising, and sale of the Products violates the misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, *et. seq.*), including but not limited to:

a. Section 110665 (a food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 343(q));

b. Section 110705 (a food is misbranded if words, statements and other information required by the Sherman Law to appear food labeling is either missing or not sufficiently conspicuous);

c. Section 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded;

d. Section 110765, which makes it unlawful for any person to misbrand any food; and

e. Section 110770, which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

43.    Defendant has violated 21 U.S.C. § 343(a), and the standards set by FDA regulations, including but not limited to 21 C.F.R. § 101.9 (c)(7), which have been incorporated by reference in the Sherman Law, by failing to include on their product labels the nutritional information required by law.

44.    A reasonable consumer would expect that the Products provide what Defendant identifies them to provide on the product labels and that the labels would not be contrary to the policies or regulations of the State of California and/or the FDA. For example, a reasonable consumer would expect that when Defendant labels its Products with "15G PROTEIN" as it claimed on the Perfect Bar in Dark Chocolate Chip Peanut Butter flavor label, the Products would provide 15 grams of protein per serving in a form their bodies could use as protein.

45.    Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendant's food labeling claims, especially at the point of sale. Reasonable consumers do not walk around with the PDCAAS values for various protein sources stored in their heads. Its discovery requires investigation well beyond the grocery store aisle and knowledge of food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge necessary to ascertain that a serving of a Product does not provide the number of grams of protein that is represented on the front of the product package. An average consumer also lacks the specialized knowledge necessary to determine the PDCAAS for the

Products. The average reasonable consumer had no reason to suspect that Defendant's representations on the packages were misleading or unlawful. Therefore, consumers had no reason to investigate whether the Products actually do provide the amount of protein per serving that the labels claim they do and reasonably relied on Defendant's representations regarding the nature of the Products.

46.    Defendant intends and knows that consumers will and do rely upon front label claims in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendant has done with the claims on the Products that they contain and provide specific amounts of protein per serving.

**Defendant Unlawfully Markets the Products to Increase Profits and Gain a Competitive Edge**

47.    In making unlawful representations, Defendant distinguishes the Products from its competitors' products. Defendant knew and intended that consumers would purchase, and pay a premium for, products labeled with a protein claim. By using this branding and marketing strategy, Defendant is stating that the Products are superior to, better than, and more nutritious and healthful than other products that do not make protein claims or that properly provide the required statement of the corrected amount of protein in the product as determined by the PDCAAS method and express as a %DV.

**Defendant Intends to Continue to Market the Products as Containing More Protein than the Products Actually Contain**

48.    Because consumers pay a price premium for products that make protein claims, and also pay a premium for products that provide more protein, by labeling its Products as containing more grams of protein per serving than they actually provide, Defendant is able to both increase its sales and retain more profits.

49.    Defendant engaged in the practices complained of herein to further its private interests of: (i) increasing sales of the Products while decreasing the sales of competitors that do not misrepresent the number of grams of protein contained in its products, and/or (ii) commanding

a higher price for its Products because consumers will pay more for the Products due to consumers' demand for products containing more protein.

50.     The market for protein products is continuing to grow and expand, and because Defendant knows consumers rely on representations about the number of grams of protein in food products, Defendant has an incentive to continue to make such unlawful representations. In addition, other trends suggest that Defendant has no incentive to change its labeling practices.

51.     For example, one market analysis revealed that between 2013-2017, product launches with a protein claim grew 31%.[5]

52.     To capitalize on the growing market, Defendant continues to launch new product lines and flavors to diversify its portfolio to maintain its competitive edge. Moreover, Defendant has continued to replicate its misrepresentations on new products. It is therefore likely that Defendant will continue to unlawfully advertise the Products and perpetuate the misrepresentations regarding the protein in the Products.

## PLAINTIFFS' EXPERIENCES

**Chong**

53.     Plaintiff Chong has purchased Perfect Bar protein bars in the Dark Chocolate Chip Peanut Butter flavor at stores in the Bay Area, including Safeway in Daly City, California and Target in Colma, California, from approximately January 2018 to approximately March 2020.

54.     Plaintiff Chong made each of her purchases of the Perfect Bar protein bar in Dark Chocolate Chip Peanut Butter flavor after reading and relying on the product front labels that promised that the bars provided "15G PROTEIN" on the front of the product package. She relied on the protein representation for each purchase and purchased each product because of the protein representations. She also believed in the truth of each representation, i.e., that the product would actually provide her the specific amount of protein on the front label in a form her body could utilize as protein. Had Defendant complied with the law, and not made the protein claims on the

---

[5] https://www.bakeryandsnacks.com/Article/2018/11/26/10-key-snack-trends-to-watch?utm_source=copyright&utm_medium=OnSite&utm_campaign=copyright

front of its packages in these circumstances, she would not have been drawn to the Products and would not have purchased them. At a minimum she would have paid less for each Product.

55.    Moreover, had Defendant adequately disclosed the corrected amount of protein per serving for each Product expressed as a %DV, as FDA regulations require, Plaintiff Chong would not have purchased the Products or would have, at minimum, paid less for them. Plaintiff Chong regularly checks the NFP before purchasing any product and uses that as a basis for buying and/or comparing similar products. She looked at and read the NFP on the Perfect Bar protein bar in Dark Chocolate Chip Peanut Butter flavor before purchasing it for the first time. Ms. Chong is, and was at the time of her purchase, a marathon runner in training for whom high protein intake is important. She examines the %DV column for protein when manufacturers provide that information, although not all always do. When manufacturers provide that information, she will always choose the product that provides more of the recommended daily value of protein (i.e., has a higher %DV for protein) because, to ensure her body gets the protein it needs for running marathons and recovering therefrom, she needs to make sure she receives an ample amount of protein. When a manufacturer does not provide a %DV for protein, she can only go off of the stated grams of protein, and she assumes that all of those disclosed grams are in a form her body can use as protein.

56.    When she purchased the Perfect Bar protein bars in the Dark Chocolate Chip Peanut Butter flavor, relying on the representation of "15G PROTEIN" per serving, Plaintiff was looking for a product that would provide her 15 grams of useable protein per serving. Had she seen that the product provided only 15% (or less) of the daily value for protein—i.e., only approximately 7 grams or less corrected amount of protein per serving—she would not have purchased the product or, at a minimum would have paid less for it. Plaintiff would also have used the information as a basis to compare similar products and would have chosen instead to purchase one with a higher %DV. Without the statement of the corrected amount of protein per serving in the form of a %DV, the only information plaintiff had about the Products was the 15 gram protein quantity claim, and she believed she was receiving the full amount of that quantity in a form her body could use. Because the Products did not provide any statement of the corrected amount of protein per serving,

she did not have any reason to believe that the Products provided less protein than the amount represented in the NFP and on the front of the label. Nor did she have any reason to know the Products consisted of anything other than high quality proteins, and did in fact believe she was receiving 15 grams of high quality protein.

57.     Plaintiff Chong not only purchased the Products because the labels said that they provided a specified amount of protein per serving, but she also paid more money for the Products than she would have paid had the product not unlawfully contained a protein claim, or had that protein claim not unlawfully omitted the %DV of protein it provided.

58.     Had Defendant complied with the law and not included protein claims on the front label, or provided a statement of the corrected amount of protein per serving in the NFP Plaintiff Chong would not have purchased the Products or, at a very minimum, she would have paid less for them..

59.     Plaintiff Chong continues to desire to purchase protein products, including those marketed and sold by Defendant. If the Products were reformulated to provide the grams of protein that are represented on the labels, Plaintiff Chong would likely purchase them again in the future. Plaintiff Chong regularly visits stores where the Products and other protein products are sold. Because Plaintiff Chong does not know the formula for Defendant's products and cannot test whether or not the Products provide the amount of protein that is represented on the label.

**Roffman**

60.     Plaintiff Roffman has purchased Perfect Peanut Butter Cups Dark Chocolate and Milk Chocolate flavor at stores in the Bay Area, including Whole Foods on Ocean Avenue in San Francisco, California from approximately January 2019 to approximately January 2022.

61.     Plaintiff Roffman made each of her purchases of the Perfect Peanut Butter Cups after reading and relying on the product front labels that promised that the bars provided "7G PROTEIN" on the front of the dark chocolate package and "8G PROTEIN" on the front of the milk chocolate package. She relied on the protein representation for each purchase and purchased each product because of the protein representations. She also believed in the truth of each representation, i.e., that the product would actually provide her the specific amount of protein on

the front label in a form her body could utilize as protein. Had Defendant complied with the law, and not made the protein claims on the front of its packages in these circumstances, she would not have been drawn to the Products and would not have purchased them. At a minimum she would have paid less for each Product.

62.     Moreover, had Defendant adequately disclosed the corrected amount of protein per serving for each Product expressed as a %DV, as FDA regulations require, Plaintiff Roffman would not have purchased the Products or would have, at minimum, paid less for them. Plaintiff Roffman regularly checks the NFP before purchasing any product and uses that as a basis for buying and/or comparing similar products. She looked at and read the NFP on the Peanut Butter cups before purchasing them for the first time. Plaintiff Roffman is very concerned about protein content because of her age and her career as a yoga instructor; she regularly does weight training to build muscle and avoid sarcopena, and feels a strong need to consume high quality proteins to keep and add muscle. She examines the %DV column for protein when manufacturers provide that information, although not all always do. When manufacturers provide that information, she will always choose the product that provides more of the recommended daily value of protein (i.e., has a higher %DV for protein) because, as an older person who wishes to continue to practice and teach yoga multiple times each day and maintain her muscle mass, she needs to make sure she receives an ample amount of protein. When a manufacturer does not provide a %DV for protein, she can only go off of the stated grams of protein, and she assumes that all of those disclosed grams are in a form her body can use as protein.

63.     When she purchased the Perfect Peanut Butter Cups Dark Chocolate and Milk Chocolate flavor, relying on the representations of "7G PROTEIN" (for dark chocolate) and "8G PROTEIN" (for milk chocolate) per serving, Plaintiff Roffman was looking for a product that would provide her 7 or 8 grams of useable protein per serving. Had she seen that the products provided only ~8% (or less) of the daily value for protein—i.e., only approximately 3.5 grams (for dark chocolate) or 4 grams (for milk chocolate), or less corrected amount of protein per serving— she would not have purchased the products or, at a minimum would have paid less for them. Plaintiff Roffman would also have used the information as a basis to compare similar products and

would have chosen instead to purchase one with a higher %DV. Without the statement of the corrected amount of protein per serving in the form of a %DV, the only information Plaintiff had about the Products was the 7 and 8 gram protein quantity claims, and she believed she was receiving the full amount of that quantity in a form her body could use. Because the Products did not provide any statement of the corrected amount of protein per serving, she did not have any reason to believe that the Products provided less protein than the amount represented in the NFP and on the front of the label. Nor did she have any reason to know the Products consisted of anything other than high quality proteins, and did in fact believe she was receiving 7 or 8 grams of high quality protein.

64.     Plaintiff Roffman not only purchased the Products because the labels said that they provided a specified amount of protein per serving, but she also paid more money for the Products than she would have paid had the product not unlawfully contained a protein claim, or had that protein claim not unlawfully omitted the %DV of grams of protein it provided.

65.     Had Defendant complied with the law and not included protein claims on the front label, or provided a statement of the corrected amount of protein per serving in the NFP Plaintiff Roffman would not have purchased the Products or, at a very minimum, she would have paid less for them.

66.     Plaintiff Roffman continues to desire to purchase protein products, including those marketed and sold by Defendant. If the Products were reformulated to provide the grams of protein that are represented on the labels, Plaintiff Roffman would likely purchase them again in the future. Plaintiff Roffman regularly visits stores where the Products and other protein products are sold. Because Plaintiff Roffman does not know the formula for Defendant's products and cannot test whether or not the Products provide the amount of protein that is represented on the label.

## **CLASS ALLEGATIONS**

67.     Plaintiffs bring this class action lawsuit on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

The Class: All persons in the United States who purchased the Products between April 22, 2018 and the present.

The California Subclass: All persons in the State of California who purchased the Products between April 22, 2018 and the present.

57.     This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed classes are easily ascertainable.

68.     Numerosity: Plaintiffs do not know the exact size the Classes, but they estimate that it is composed of more than 100 persons. The persons in the Classes are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

58.     Common Questions Predominate: This action involves common questions of law and fact to the potential Classes because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that the Products contained the amount of protein as represented on the Product labels. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Classes to recover. The questions of law and fact common to the Classes are:

   a.   What is the PDCAAS for the protein in the Products;

   b.   Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are unlawful;

   c.   Whether Defendant's actions violate Federal and California laws invoked herein;

   d.   Whether labeling the Products with a protein claim causes the Products to command a price premium in the market;

   e.   Whether Defendant's failure to provide a statement of the corrected amount of protein per serving in the Products sold to the Class and Subclass members causes the Products to command a price premium in the market;

   f.   Whether representations regarding the number of grams of protein in the Products are material to a reasonable consumer;

g.  Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

h.  The amount of profits and revenues Defendant earned as a result of the conduct;

i.  Whether Class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

j.  Whether Class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

69.  Typicality: Plaintiffs' claims are typical of the claims of the other members of the Classes because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each member of the Classes were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

70.  Adequacy of Representation: Plaintiffs will fairly and adequately protect the interests of all Class and Subclass members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests that are in conflict with, or antagonistic to, the interests of the Class and Subclass members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the Classes. By prevailing on their own claims, Plaintiffs will establish Defendant's liability to all Class and Subclass members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class and Subclass members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class and Subclass members.

71.  Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to

which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

72.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

Plaintiffs do not plead, and hereby disclaim, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiffs rely on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

## PLAINTIFFS' FIRST CAUSE OF ACTION

**(Unlawful, unfair, and fraudulent trade practices in violation of Business and Professions Code § 17200, *et seq.*)**
**On Behalf of Plaintiffs and the Subclass**

73.     Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

74.     Plaintiffs bring this claim individually and on behalf of the other members of the Subclass.

75.     Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendant has engaged, and continues to engage, in unlawful trade practices in California by engaging in the unlawful business practices outlined in this complaint.

76.     In particular, Defendant has engaged, and continues to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the advertising

provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (ii) the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110760, 110765, and 110770; and (iii) and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), *et seq.* and FDA regulations, including but not limited to 21 C.F.R. §§ 101.9 (c)(7), 101.13 (b), and (n),  which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

77.     In particular, Defendant has engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, the following: (i) unlawfully making a protein claim on the front of some of the Product packages without complying with the regulatory requirements for making a protein claim set forth in 21 C.F.R. § 101.9(c)(7)(i)-(iii), 101.13 (b), and (n), and incorporated by reference by California's Sherman law; and (ii) failing to provide a statement of the corrected amount of protein per serving in the NFP, calculated according to the PDCAAS method and expressed as a %DV, as required by 21 C.F.R. §§ 101.9(c)(7)(i)-(iii), which are also so incorporated into the Sherman Law.

78.     Plaintiffs and those similarly situated relied to their detriment on Defendant's unlawful business practices. Had the Defendant acted lawfully and not made protein claims or provided a statement of the corrected amount of protein per serving in the NFP, Plaintiffs and those similarly situated would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of the Products, or (iii) paying less for the Products.

79.     Defendant engaged in these unlawful practices to increase its profits. Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

80.     The aforementioned practices, which Defendant has used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

81.     As a direct and proximate result of such actions, Plaintiffs and the other Subclass members have suffered and continue to suffer injury in fact and have lost money and/or property

as a result of such unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.  Among other things, Plaintiffs and the Subclass members lost the amount they paid for the Products.

82.    As a direct and proximate result of such actions, Defendant has enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

83.    Plaintiffs seek, on behalf of themselves and those similarly situated, equitable relief, including the restitution for the premium and/or full price that they or others paid to Defendant as a result of Defendant's conduct. Plaintiffs and the Subclass lack an adequate remedy at law to obtain such relief with respect to their "unlawfulness" claims in this UCL cause of action because the California Sherman Law does not provide a direct cause of action, so Plaintiffs and the Subclass must allege those violations as predicate acts under the UCL to obtain relief.

84.    Plaintiffs seek, on behalf of those similarly situated, a declaration that the above-described trade practices are unlawful.

85.    Plaintiffs seek, on behalf of those similarly situated, an injunction to prohibit Defendant from continuing to engage in the unlawful trade practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they were not entitled. Plaintiffs and those similarly situated have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and those similarly situated, respectfully request that the Court enter judgement against Defendant as follows:

A.    Certification of the proposed Class and Subclass, including appointment of

1    Plaintiffs' counsel as class counsel;

2    B.    An order temporarily and permanently enjoining Defendant from continuing the

3          unlawful business practices alleged in this Complaint;

4    C.    An award of compensatory damages in an amount to be determined at trial, except

5    for those causes of action where compensatory damages are not legally available;

6    D.    An award of statutory damages in an amount to be determined at trial, except for

7    those causes of action where statutory damages are not legally available;

8    E.    An award of punitive damages in an amount to be determined at trial, except for

9    those causes of action where punitive damages are not legally available;

10   F.    An award of treble damages, except for those causes of action where treble

11   damages are not legally available;

12   G.    An award of restitution in an amount to be determined at trial;

13   H.    An order requiring Defendant to pay both pre- and post-judgment interest on any

14         amounts awarded;

15   I.    For reasonable attorneys' fees and the costs of suit incurred; and

16   J.    For such further relief as this Court may deem just and proper.

17                           **<u>JURY TRIAL DEMANDED</u>**

18   Plaintiffs hereby demand a trial by jury.

19   Dated: October 3, 2022

20                                      **GUTRIDE SAFIER LLP**

21                                      */s/Anthony J. Patek/s/*
                                        Seth A. Safier, Esq.
22                                      Marie McCrary, Esq.
                                        Hayley Reynolds, Esq.
23                                      Anthony J. Patek, Esq.
                                        100 Pine Street, Suite 1250
24                                      San Francisco, CA 94111

25

26

27

28

**Exhibit A**

| Product Type | Variety/Flavor | Front Package Protein Nutrient Content Claim | DV% in NFP |
|---|---|---|---|
| Perfect Bar | Dark Chocolate Chip Peanut Butter | 15g | 21% |
| Perfect Bar | Peanut Butter | 17g | 21% |
| Perfect Bar | Coconut Peanut Butter | 16g | 19% |
| Perfect Bar | Pumpkin Pie | 14g | 20% |
| Perfect Bar | Salted Caramel | 12g | 20% |
| Perfect Bar | Almond Butter | 13g | 15% |
| Perfect Bar | Dark Chocolate Almond Butter | 12g | 14% |
| Perfect Bar | Chocolate Mint | 14g | 20% |
| Perfect Bar | Blueberry Cashew | 12g | 19% |
| Perfect Bar | Chocolate Hazelnut Crisp | 12g | 16% |
| Perfect Bar | Chocolate Chip Cookie Dough with Sea Salt | 14g | 20% |
| Perfect Bar Snack Size | Peanut Butter | 6g | 8% |
| Perfect Bar Snack Size | Dark Chocolate Chip Peanut Butter | 6g | 8% |
| Perfect Kids Bar | Chocolate Chip | 7g | No DV |
| Peanut Butter Cups | Dark Chocolate with Sea Salt | 7g | No DV |
| Peanut Butter Cups | Milk Chocolate | 8g | No DV |
| Peanut Butter Cups | Dark Chocolate Mint | 7g | No DV |